RATTET PASTERNAK, LLP
Proposed Attorneys for the Debtor
550 Mamaroneck Avenue
Harrison, New York 10528
(914) 381-7400
Jonathan S. Pasternak, Esq.
Elan A. Gershoni, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
In re:

                                                             Chapter 11

PARTY SHOPS PLUS, INC.                         Case No. 11-23393 (RDD)

                                    Debtor.
------------------------------------------------------------------------X

## AFFIDAVIT OF SOFIA MATA
## PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2

STATE OF NEW YORK        )
                                     ) SS.:
COUNTY OF WESTCHESTER  )

Sofia Mata, being duly sworn deposes and says:

      1.      I am the President of Party Shops Plus, Inc. (the "Debtor"). As such, I am familiar with the Debtor's operations, businesses and financial affairs.

      2.      I submit this affidavit pursuant to Rule 1007(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1007-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules").

**Local Rule 1007-2(a)(1)**

      3.      The Debtor is located in the Midway Shopping Center (the "Mall") with an address of 973 Central Park Avenue, Scarsdale, New York 10583-3211 (the "Premises").

      4.      The Debtor is retail store that sells party and seasonal goods and supplies that operates in a space of over ten thousand (10,000) square feet in the Premises.

1

5. The Debtor occupies the Premises pursuant to an unexpired lease (the "Lease") with Midway Shopping Center, L.P. (the "Landlord").

6. The Lease provides, inter alia, that no other tenant in the Mall may sell goods which overlap with the category of goods sold by the Debtor such as: party goods and supplies, costumes, Halloween accessories, wigs, greeting cards, craft supplies and cake decorating supplies, candy making supplies, scrapbooking supplies, wedding favors, high quality stationary and imprintables, invitation printing and invitation book ordering, art pens makers and supplies and items related to and commonly sold in stores selling the foregoing; including as well, but is not limited to balloons, disposable licensed party tableware and decorations, seasonal items for Halloween, Valentine's Day, St. Patrick's Day, Easter, Graduation, Patriotic, Luau/Summer, Thanksgiving, Christmas and New Years (the "Overlap Goods") in more than twenty percent (20%) of their premises (the "Exclusive").

7. Jerrold C. Klein ("JCK") was the sole shareholder and officer of the Debtor until he passed away on February 1, 2008. In his will, he left most of the estate to his niece, Nina Bruder ("Nina") including the Debtor's business. The remainder of the estate was left to his sister, Leslie Bruder, and nephew, Michael Bruder ("Michael").

8. JCK personally guaranteed rent payments on the Lease to the Landlord for two years in the event that the Debtor defaulted on its rental obligations to the Landlord (the "Guarantee").

9. At the time of JCK's death, the Debtor's obligation to the Landlord totaled over one million dollars ($1,000,000.00). Had the Landlord sought to satisfy the Debtor's debts by seeking satisfaction pursuant to the Guarantee, it would have consumed the entirety of JCK's estate.

10. In the spring of 2008, Michael, who I am married to, made an agreement (the "Management Agreement") with Nina and her husband Gary Prestfelder ("Gary") which provided that:

    a) 70% of the common shares of the Debtor would be transferred to me and 30% would remain with Nina;

    b) I would take the title of President of the Debtor and leave my position at Citibank to direct and manage the Debtor's day-to-day operations; and

    c) The Debtor's board of directors would be composed of: Nina, Gary, Michael, and myself (collectively, without Michael, the "Board of Directors")[1].

11. The Management Agreement was predicated upon the Landlord's consent to several modifications in the Lease (the "Lease Modification"), including:

    a) The Guarantee would transfer to myself and Michael, but would be reduced and limited to six (6) months of personal liability;

    b) Significantly reducing the monthly rent obligations for two (2) years until a major anchor was installed in the Mall, in order to give the Debtor the chance to recover after a new anchor lease was signed, and then having the rent slowly and gradually increase in the following years;

    c) Granting the Landlord a lien in the Debtor's inventory to protect its rights in the Guarantee.

12. The Landlord agreed to the Lease Modification and, accordingly, the

---

[1] Subsequent to entering into the Management Agreement, Michael resigned from the Board of Directors.

Management Agreement became effective.

13. In 2007 and 2008, the Mall lost both of its anchor tenants, Gourmet Garage and Linens and Things (collectively, the "Anchors"), impacting the business significantly. This made it very difficult for the Debtor which, outside of the Halloween season (the "Season"), was dependent on the mall traffic created by the Anchors. Accordingly, the Debtor entered into the Lease Modification described above. At the time that the Lease Modification was executed the Landlord made a verbal representation that a new noncompeting anchor in the computer business was about to sign a lease to become a tenant in the Mall within a couple of months.

14. In late 2008, as the economy began to crumble under the weight of the current recession, the Debtor's revenues were impacted.

15. In late 2009, after experiencing substantial losses and mounting liabilities, the Board of Directors decided that the Debtor should be put into bankruptcy.

16. Prior to the Debtor's execution of a bankruptcy filing, the Landlord informed me that the Mall had just signed Shoprite Supermarket ("Shoprite") to a long term lease at the Mall and that it expected Shoprite to open a big box supermarket no later than April of 2010.

17. Due to this news, the Board of Directors determined not to put the Debtor into bankruptcy protection and Michael agreed to provide bridge capital until the Debtor's cash flow bounced back.

18. In July of 2010, it became evident to the Board of Directors that Shoprite was not going to open the following month. Accordingly, the Board of Directors asked the Landlord about its representation that Shoprite would open in August. The Landlord responded that Shoprite had several "outs" with respect to the August deadline.

4

However, the Landlord assured the Debtor that under no circumstances would Shoprite open later than October 1, 2010.

19. Given the Debtor's dismal financial status and the underlying spirit and intent of the Lease Modification to provide the Debtor with two years of operation with an anchor in the Mall, the Board of Directors sent a written proposal to the Landlord for a rent deferment for the months of August, September and October of 2010 plus postponing the annual rent increase until two years after an anchor was installed in the Mall (the "Proposal").

20. The Landlord agreed to the Stipulation in a voicemail and started drafting an amendment to the Lease according to the terms of the Proposal (the "Amendment").

21. Again, despite the Landlord's promise that Shoprite would open by October 1, 2010, it did not open until January of 2011.

22. Immediately upon opening, Shoprite began selling a significant amount of Overlap Goods.

23. Unfortunately, given Shoprite's enormous size, it was selling Overlap Goods in up to twenty thousand (20,000) square feet of its floor space, twice the size of the Debtor's floor space-clearly in violation of the Exclusive. Despite urging the Landlord to remedy this problem, Shoprite continues to sell Overlap Goods.

24. Additionally, the Landlord continues to violate the terms of the Exclusive by approving several signs on another store in the Mall, Amazing Savings, which advertises the sale of Overlap Goods that take over 20% of its sale area. On top of that, the Landlord recently informed the Debtor that a JoAnn Fabrics & Crafts ("JoAnn") will be opening in the Mall in September of 2011. Despite the Exclusive limiting JoAnn to selling Overlap Goods on at most twenty percent (20%) of its floor space, it can be

assumed, due to the nature of the goods that Joann sells, that once it opens it will take additional business away from the Debtor.[2]

25. Over the past three (3) years, Michael and I have invested and/or lent the Debtor close to three hundred thousand dollars ($300,000.00). Most of the money was used to cure outstanding debt and to maintain adequate cash flow during the slow months.

26. However, the foregoing factors, in combination with the advent of temporary seasonal "Halloween Stores" which open for only six weeks during the Season and sell the same product lines as the Debtor, have furthered the Debtor's financial distress. Accordingly, the Board of Directors determined that it is not financially sustainable to continue financing the Debtor with the hopes that it will become profitable again in the future, given the extremely competitive environment created at the mall.

27. The Debtor filed this Chapter 11 so that it could liquidate its remaining assets in an orderly and organized fashion and maximize the distribution that it can repay its creditors.

**Local Rule 1007-2(a)(2)**

28. This case was not originally commenced under Chapter 7 or 13 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code").

**Local Rule 1007-2(a)(3)**

29. Upon information and belief, no committee or professionals were employed prior to the filing of the Order for relief.

**Local Rule 1007-2(a)(4)**

30. A list of the holders of the 20 largest general unsecured claims, excluding

---

[2] JoAnn recently opened another store in Paramus, NJ in which Overlap Goods comprise 40% of their floor displays.

insiders, is annexed hereto as **Exhibit "A"**.

**Local Rule 1007-2(a)(5)**

31. A list of the holders of the 5 largest secured claims, excluding insiders, is annexed hereto as **Exhibit "B"**.

**Local Rule 1007-2(a)(6)**

32. A summary of the Debtor's estimated assets and liabilities is annexed hereto as **Exhibit "C"**.

**Local Rule 1007-2(a)(7)**

33. There are no publicly held securities of the Debtor.

**Local Rule 1007-2(a)(8)**

34. None of the Debtor's property is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity.

**Local Rule 1007-2(a)(9)**

35. The Debtor operates its business out of the Premises.

**Local Rule 1007-2(a)(10)**

36. The Debtor's substantial assets, which include equipment and materials, are located at the Store.

**Local Rule 1007-2(a)(11)**

37. The following actions or proceedings are pending against the Debtor:

*Lovin' Enterprises, Inc. dba Dreamgirl v. Party Shops Plus, Inc., et al.* with a case number: HP 11C01334, filed in the Superior Court of California, County of Los Angeles

**Local Rule 1007-2(a)(12)**

38. The Debtor's senior management consists of its President, Sofia Mata.

**Local Rule 1007-2(b)(1) and (2)**

39. The Debtor's estimated weekly payroll to employees for the thirty (30) day period following the Chapter 11 petition is $7,500.00.

40. The estimated amount to be paid for services to its officers and directors for the thirty (30) day period following the filing of the Chapter 11 petition is approximately $8,000.00

**Local Rule 1007-2(b)(3)**

41. A 30-day budget is annexed hereto as **Exhibit "D"** and is also submitted pursuant to the requirements of a small business debtor as set forth in 11 U.S.C. §1116.

*/s/ Sofia Mata*
Sofia Mata, President

Sworn to before me this
14th day of July, 2011

*/s/ James B. Glucksman*
Notary Public